People v Gilmore (2021 NY Slip Op 06880)





People v Gilmore


2021 NY Slip Op 06880


Decided on December 9, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 9, 2021

110112 110454 112380
[*1]The People of the State of New York, Respondent,
v
Dale Gilmore, Also Known as Copo, Appellant.

Calendar Date:October 12, 2021

Before:Garry, P.J., Lynch, Aarons, Pritzker and Reynolds Fitzgerald, JJ.

Danielle Neroni Reilly, Albany, for appellant, and appellant pro se.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Lynch, J.
Appeals (1) from a judgment of the Supreme Court (Hogan, J.), rendered January 17, 2018 in Schenectady County, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the second degree (two counts), reckless endangerment in the second degree and obstructing governmental administration in the second degree, and (2) by permission, from two orders of said court, entered June 26, 2018 and April 22, 2020 in Schenectady County, which denied defendant's motions pursuant to CPL 440.10 to vacate the judgment of conviction, without hearings.
On January 19, 2017, the City of Schenectady Police Department began investigating a report from the victim that her boyfriend — defendant — had fired a gun at her during an altercation at her apartment. Defendant ran from police on two occasions following the incident and, several weeks later, was arrested at an apartment in the City of Cohoes, Albany County. In connection therewith, defendant was charged by indictment with two counts of criminal possession of a weapon in the second degree, one count of reckless endangerment in the first degree and one count of obstructing governmental administration in the second degree. Following a jury trial, at which defendant was represented by counsel, he was convicted of two counts of criminal possession of a weapon in the second degree, one count of reckless endangerment in the second degree — as a lesser included offense of reckless endangerment in the first degree — and one count of obstructing governmental administration in the second degree. Defendant opted to proceed pro se at sentencing and was sentenced, as a second felony offender, to concurrent prison terms of 15 years, with five years of postrelease supervision, for each weapon possession conviction and to lesser terms of incarceration on the remaining convictions.
Thereafter, defendant made two CPL 440.10 motions to vacate the judgment of conviction,[FN1] alleging, among other things, ineffective assistance of counsel, actual innocence and a Brady violation. Both motions were denied without a hearing. Defendant appeals from the judgment of conviction and, by permission of this Court, from the orders denying his CPL article 440 motions.
On the direct appeal, defendant contends that the verdict on the weapon possession counts is not supported by legally sufficient evidence and is against the weight of the evidence. To establish the weapon possession counts as charged in the indictment, "the People were required to prove that defendant possessed a loaded firearm in a place other than his home or business" (People v Hawkins, 110 AD3d 1242, 1242 [2013], lv denied 22 NY3d 1041 [2013]; see Penal Law §§ 265.01 [1]; 265.02 [1]; 265.03 [3]), and possessed a loaded firearm "with intent to use the same unlawfully against another" (Penal Law § 265.03 [1] [b]).
At trial, the People entered into evidence a recording of the victim's 911 call on January 19, 2017 at 6:12 a.m., in which she [*2]informed the dispatcher that she was in the attic of her apartment because her "babyfather" — whom she identified as defendant — had fired a pistol at her during an argument. The victim believed that defendant was aiming for her leg and informed the dispatcher that he had left the apartment with friends. At trial, the victim testified about the circumstances precipitating the 911 call, explaining that she had confronted defendant about an alleged affair while they were in his car — a blue Nissan Maxima — and they began to argue. Once they returned to the victim's apartment, the argument turned physical, with the victim testifying that defendant pushed her against a window, causing her to spit up blood. According to the victim, at some point during their argument defendant pulled out a black semiautomatic pistol and shot it next to her "near the ground," estimating that he was within 10 to 15 feet from her. The victim recounted that defendant then left the apartment, got back into the Nissan Maxima and drove off with friends.
Three police officers — Sara McDonald, Komieko Mosher and Matthew LaPointe — proceeded to the victim's apartment in response to the 911 call, where they found her in an "agitated" state. MacDonald testified that the apartment was in disarray, with drawers pulled out and items strewn about the floor. Although the officers located a shell casing in a pile of clothing, they did not locate a handgun or observe bullet holes in the apartment. A police detective testified that the expended shell casing was of a ".22 caliber, long rifle caliber marked R-e-m for Remington," explaining that shell casings from semiautomatic firearms are ejected automatically when the firearm is shot, whereas casings from revolvers remain inside of the firearm upon discharge. He noted that bullets for .22 caliber firearms are "relatively small" and observed that, if the bullet had gone into the carpet, "it could have been concealed by the fabric." One of the officers checked with a neighbor, who confirmed that he had not heard any loud noises around the time of the incident.
MacDonald and Mosher testified that, while they were at the victim's apartment, she became uncooperative, kept looking down at her phone, refused to answer questions and declined to go to the police station. The victim conceded as much at trial, testifying that, while the officers were at the apartment, she and defendant were texting each other and defendant "was telling [her] not to say [any]thing." After the police officers left the victim's apartment, she met defendant around the corner and got into the front passenger seat of the Nissan Maxima.
The People also presented evidence that, around 9:20 a.m. on the date of the incident, officers with the City of Schenectady Police Department spotted a blue Nissan Maxima and, when they attempted to pull it over, the driver and a back seat passenger ran. The victim, who was in the vehicle, confirmed that defendant was the [*3]individual who ran from the driver seat, evading apprehension. A few weeks later, on the evening of February 4, 2017, Robert Piazza — an officer with the City of Cohoes Police Department — observed a vehicle fail to signal a turn on two occasions. When Piazza pulled the vehicle over, the driver stepped out but fled. Shining his flashlight, Piazza was able to see the driver's face and identified him at trial as defendant. Defendant was eventually apprehended at an apartment in Cohoes, where he was present with the victim and provided police with a false name.[FN2]
The People also submitted evidence that the victim and a contact in her phone named "BD" — whom the victim confirmed at trial was defendant — had exchanged text messages following the incident. At 6:17 a.m. on January 19, 2017, "BD" texted the victim, "Don't say nothing" and at 6:20 a.m. — after the victim placed her call to police — "BD" sent another text stating, "[D]on't snitch again." Finally, the People proffered evidence that defendant made a series of telephone calls to the victim from jail following his arrest, during which he told her "[t]o do the right thing," a statement that the victim believed meant to "[n]ot tell on him."
Defendant elected to testify on his own behalf, confirming that, on the morning of January 19, 2017, he and the victim got into a verbal altercation about an alleged affair. According to defendant, the altercation turned physical when the victim "mushe[d]" his face. Defendant maintained that, during the course of this argument, the victim tried to hit him with an unidentified "weapon" that she had obtained from a dresser drawer, but he blocked it and pushed it away, hitting the victim in the face. When he went to retrieve his hoodie to leave the apartment, he saw the victim "standing right there with a gun." Defendant maintained that the victim shot the gun, he jumped back and fell, and the gun hit the floor. Defendant testified that, as he was leaving, the victim told him to take the gun and he refused. He denied ever possessing or shooting a gun during the altercation.
Defendant admitted at trial that, after he left the apartment, he texted the victim, "Don't say anything[,] [d]on't snitch again." He maintained that he did so to protect the victim since he believed that she was pregnant with his child. Defendant also conceded that he sent the victim a text message that said "[w]rong move . . . [j]ust shut the [expletive] up," but was adamant that this was in reference to the fact that she had shot at him and he did not want her talking to police. According to defendant, he ran from police because his license was suspended and he believed they would shoot him if they thought he was armed. When questioned about the statements that he made on the telephone calls to the victim from jail, defendant admitted to telling the victim that being together depended on how she did in front of the grand jury, but insisted he was trying to protect her. [*4]Defendant lastly admitted that he had pleaded guilty to a felony in 2012.
Although no weapon was recovered and no bullet holes were observed in the victim's apartment, "we do not distinguish between direct or circumstantial evidence in conducting a legal sufficiency and/or weight of the evidence review" (People v Terry, 196 AD3d 840, 841 [2021], lvs denied 37 NY3d 1027, 1030 [2021]; see People v Tunstall, 149 AD3d 1249, 1252 [2017], lv denied 30 NY3d 1023 [2017]).[FN3] The victim testified that defendant shot a gun in her direction from within 10 to 15 feet after a domestic dispute. Viewing this evidence in the light most favorable to the People, we conclude that there is a "valid line of reasoning and permissible inferences [which] could lead a rational person to the conclusion reached by the fact finder" on the weapon possession counts (People v Malloy, 166 AD3d 1302, 1304-1305 [2018] [internal quotation marks and citations omitted], affd 33 NY3d 1078 [2019]; see People v Taylor, 196 AD3d 851, 852-853 [2021], lvs denied 37 NY3d 1025, 1030 [2021]).
As to the weight of the evidence, a different verdict would not have been unreasonable had the jury credited defendant's version that the victim was the one who possessed and shot the gun. Plainly, the competing accounts presented a credibility issue for the jury to resolve. We conclude that the jury could reasonably choose to believe the victim's version of events, particularly given defendant's incriminating text messages and the fact that he fled from police on two occasions and gave a false name upon his arrest. Considering that defendant had a prior conviction, we are satisfied that the verdict on the weapon possession counts is not against the weight of the evidence (see People v Meadows, 180 AD3d 1244, 1246-1247 [2020], lv denied 35 NY3d 994 [2020]; People v Burden, 108 AD3d 859, 860 [2013], lv denied 22 NY3d 1197 [2014]).
Defendant's contention that the People failed to provide CPL 710.30 notice of their intent to introduce certain statements he made to Piazza after his arrest, including that he gave a false name, is unpreserved for our review, as defendant did not object to the introduction of such statements at trial (see People v Martinez, 9 AD3d 679, 680 [2004], lvs denied 3 NY3d 705, 709 [2004]; People v Dobbs, 194 AD2d 996, 997 [1993], lvs denied 82 NY2d 804, 807, 805 [1993]). His related CPL 710.30 argument directed at the People's failure to give pretrial notice of their intent to have Piazza identify him in court as the person who fled during the February 4, 2017 traffic stop is similarly unpreserved. In any event, it lacks merit, as Piazza's in-court identification — which was not the product of a police-arranged identification procedure — did not implicate the statutory notice requirements set forth in CPL 710.30 (1) (b) (see People v Russell, 167 AD3d 1326, 1328 [2018], lv denied 33 NY3d 981 [2019]; People v Anderson, 149 AD3d 1407, 1411 [2017], lv denied 30 NY3d 947 [2017]).[*5]
We also reject defendant's contention that Supreme Court erred in admitting the victim's statements on the 911 call under the excited utterance exception to the hearsay rule. "An out-of-court statement is properly admissible under the excited utterance exception when made under the stress of excitement caused by an external event, and not the product of studied reflection and possible fabrication" (People v Johnson, 1 NY3d 302, 306 [2003]; accord People v McCauley, 162 AD3d 1307, 1309 [2018], lv denied 32 NY3d 939 [2018]). On the 911 call, the victim stated, in a frantic tone, that defendant shot a gun in her direction and that she was in the attic because she did not know whether he was going to return, implying that the call was made "relatively contemporaneous to the incident" (People v McCauley, 162 AD3d at 1309). The dispatcher who received the call confirmed at trial that the victim sounded "[v]ery excited" and "[e]motionally . . . distraught," and the responding police officers described her as "agitated" and "hysterical" when they arrived. In these circumstances, "we are satisfied that the victim's call was made 'under the stress and excitement of a startling event and [was] not the product of any reflection and possible fabrication'" (People v Ruffin, 191 AD3d 1174, 1181 [2021], lv denied 37 NY3d 960 [2021], quoting People v Haskins, 121 AD3d 1181, 1184 [2014], lv denied 24 NY3d 1120 [2015]).
Similarly unpersuasive is defendant's contention that the People failed to provide a proper foundation for admission of the 911 call because they did not establish the victim's identity as the caller. "'The foundational requirements for admission of a recorded conversation include proof of both the authenticity of the tape and the identity of the speakers on the tape'" (People v Lancaster, 121 AD3d 1301, 1304 [2014], lv denied 24 NY3d 1121 [2015], quoting People v Vanhoesen, 31 AD3d 805, 807 [2006]). "'[A] speaker's identity may be proven through circumstances surrounding the recorded conversation, which must include sufficient indica of reliability'" (People v Lancaster, 121 AD3d at 1304, quoting People v Vanhoesen, 31 AD3d at 808). At trial, the 911 dispatcher revealed that he had listened to a recording of the call and confirmed that it was true, accurate and unaltered. Although the victim was not asked at trial to identify her voice on the call — and the dispatcher had no basis upon which to make such an identification — the caller identified herself by the victim's name on the recording and the victim confirmed at trial that she had called police from her attic, a fact that is consistent with the statements relayed on the 911 call. In these circumstances, the victim's identity as the caller on the 911 recording was sufficiently established by the surrounding circumstances and a proper foundation was laid for admission of the recording (see People v Lynes, 49 NY2d 286, 292-293 [1980]; People v Shapiro, 227 AD2d 506, 507 [1996], lv [*6]denied 88 NY2d 1024 [1996]).
Defendant also contends that Supreme Court erred in issuing a material witness order to compel the victim's testimony. To the extent preserved, this argument lacks merit. As relevant here, CPL 620.20 (1) provides that "[a] material witness order may be issued upon the ground that there is reasonable cause to believe that a person whom the [P]eople
. . . desire to call as a witness in a pending criminal action
. . . [p]ossesses information material to the determination of such action[] and [w]ill not be amenable or responsive to a subpoena at a time when his [or her] attendance will be sought." The testimony at the material witness hearing established that, although the victim appeared before a grand jury in February 2017 pursuant to a subpoena, she later became reluctant to cooperate in the prosecution, prompting the District Attorney's office to serve her with another subpoena directing her to appear for trial. A day before the trial was scheduled to commence, an Assistant District Attorney contacted the victim and she "more or less told him that [the District Attorney's office] couldn't make her appear and testify, . . . couldn't make her answer the subpoena and . . . she wouldn't come." On the first day of the scheduled trial, the victim did not appear pursuant to the subpoena. Given these circumstances, Supreme Court did not err in issuing a material witness order to secure the victim's appearance (see CPL 620.20 [1]).
Defendant asserts that counsel was ineffective for failing to object when the People called an Assistant District Attorney to testify. At trial, the People called Brian Gray — a senior Assistant District Attorney in Schenectady County — to provide testimony regarding the victim's initial hesitancy to cooperate in the prosecution in an apparent attempt to establish that defendant had pressured her not to divulge unfavorable information relevant to the case. Even assuming, without deciding, that there was no strategic reason for defense counsel not to object to Gray being called as a witness, in our view, any error in this respect was not "sufficiently egregious and prejudicial as to compromise defendant's right to a fair trial" (People v Caban, 5 NY3d 143, 152 [2005]). This is all the more so when considered against the totality of the representation, which was meaningful (see People v Benevento, 91 NY2d 708, 712-713 [1998]).
Additionally, defendant contends that Supreme Court failed to make a sufficient inquiry to ensure that his purported waiver of the right to counsel at sentencing was knowing, voluntary and intelligent. To begin, it must be emphasized that "the sentencing process is a crucial stage of the criminal process" (People v Perry, 36 NY2d 114, 119 [1975]; see generally Mempa v Rhay, 389 US 128 [1967]), and a criminal defendant has a constitutional right to be represented by counsel at sentencing (see People v Harris, 79 NY2d 909, 910 [1992]; People v Read, 134 AD2d 462, 463 [*7][1987]; People v Taylor, 116 AD2d 678, 678 [1986]). Nevertheless, a defendant may forgo that right and choose to proceed pro se. When a defendant invokes the right to proceed pro se, "the trial court must determine whether the defendant is knowingly, voluntarily and intelligently waiving the right to counsel" (People v Grays, 162 AD3d 1224, 1226 [2018], lv denied 32 NY3d 111 [2018]; see People v Crampe, 17 NY3d 469, 481 [2011], cert denied 565 US 1261 [2012]). "In ascertaining whether such a waiver is knowing, voluntary and intelligent, the court must 'test an accused's understanding of the waiver' and be reasonably certain that [he or she] appreciates the dangers and disadvantages of giving up the fundamental right to counsel'" (People v Grays, 162 AD3d at 1226, quoting People v Smith, 92 NY2d 516, 520 [1998]). Although the Court of Appeals has "eschewed application of any rigid formula and endorsed the use of a nonformalistic, flexible inquiry," it has nevertheless required that the trial court "accomplish the goals of adequately warning a defendant of the risks inherent in proceeding pro se, and apprising a defendant of the singular importance of the lawyer in the adversarial system of adjudication" (People v Crampe, 17 NY3d at 482 [internal quotation marks and citations omitted]).
At an appearance on November 14, 2017 — following the verdict but prior to sentencing — defendant stated that his attorney was no longer authorized to speak on his behalf. Supreme Court inquired as to whether defendant wished to "proceed in this sentencing pro se" and defendant answered in the affirmative. A recess was taken to allow defendant to review the presentence investigation report and, when the proceedings resumed, Supreme Court again inquired as to whether defendant was "sure" that he wanted to represent himself. Defendant responded, "100 percent." Supreme Court then inquired as to defendant's competency, asking pedigree information regarding his age, education and mental status. The court also pointed out that defendant was "not legally trained" and stated that "there are certain things at sentencing" for which "you may want the benefit of an attorney to represent you." Defendant confirmed that he understood and wished to proceed pro se, and Supreme Court found that he had the "aptitude and capability" to do so, ultimately permitting him to represent himself at sentencing with his trial attorney present as standby counsel.
At the beginning of the sentencing hearing on January 17, 2018 — at which defendant's trial attorney was present — Supreme Court again probed defendant's mental capacity by inquiring into his date of birth and Social Security number. The court asked defendant whether he remembered the questions that he had been asked at the November 2017 appearance relative to the purported waiver of counsel and he confirmed again that he wished to proceed pro se. The sentencing proceeding was then conducted with defendant acting pro se[*8]. Cumulatively, we find that the court's inquiry was sufficient and there was no error in its determination to allow defendant to represent himself at sentencing with the added safeguard of trial counsel serving as standby counsel (see People v Franklin, 146 AD3d 1082, 1085 [2017], lvs denied 29 NY3d 946, 948 [2017]).
Defendant's contentions that Supreme Court erred in failing to remove juror No. 2 from the jury panel and to inquire whether the jury had engaged in premature deliberations are unpreserved (see People v Lancaster, 143 AD3d 1046, 1051 [2016], lv denied 28 NY3d 1147 [2017]; People v Johnson, 264 AD2d 632, 633 [1999], lv denied 94 NY2d 864 [1999]). Similarly unpreserved are defendant's claims that the People violated the advocate-witness rule and the unsworn witness rule when they called Gray to testify (see People v Jimenez, 93 AD3d 422, 423 [2012], lv denied 19 NY3d 864 [2012]; People v Tapper, 64 AD3d 620, 621 [2009], lv denied 13 NY3d 911 [2009]), and his claims of prosecutorial misconduct related to certain statements made by the prosecutor throughout the proceedings (see People v Rivera, 31 AD3d 1060, 1061 [2006], lv denied 7 NY3d 869 [2006]). We have considered and find defendant's remaining contentions on the direct appeal unavailing.
With respect to the denial of defendant's CPL 440.10 motions, Supreme Court did not err in denying his motions without a hearing. "[A] hearing is only required if the submissions 'show that the nonrecord facts sought to be established are material and would entitle [the defendant] to relief'" (People v Brandon, 133 AD3d 901, 903 [2015], lvs denied 27 NY3d 992, 1000 [2016], quoting People v Satterfield, 66 NY2d 796, 799 [1985]; see People v Beverly, 196 AD3d 864, 865 [2021], lv denied 37 NY3d 1058 [2021]). Defendant maintains that his state and federal constitutional rights were violated because the Schenectady County Jail uses a "paging" system that requires incarcerated individuals to request case law by exact citation, preventing him from adequately researching his case. Although this contention does not appear on the face of the record and is properly asserted in the context of a CPL 440.10 motion, defendant did not submit "sworn allegations substantiating or tending to substantiate all the essential facts" relative to this claim (CPL 440.30 [4] [b]; see People v Wright, 27 NY3d 516, 521 [2016]; People v Brandon, 133 AD3d at 904). In any event, such a claim requires proof that "the alleged shortcomings in the library or legal assistance program [offered by the jail] hindered [defendant's] efforts to pursue a [nonfrivolous] legal claim" (Lewis v Casey, 518 US 343, 351 [1996]; see Matter of Bruni v New York State Commn. of Corr., 195 AD3d 1250, 1251 [2021]) — an allegation that is missing from the motion papers.
As to his other CPL 440.10 claims, defendant argues that the People committed a Brady violation by failing to disclose the existence of a cooperation agreement between the People [*9]and the victim in which the People purportedly agreed to dismiss certain of the victim's pending criminal charges in exchange for her testimony at trial. Although "the existence of an agreement between the prosecution and a witness, made to induce the testimony of the witness, is evidence which must be disclosed under Brady principles" (People v Novoa, 70 NY2d 490, 496 [1987] [internal quotation marks and citations omitted]), defendant's claim in this respect is unsubstantiated and conclusory (see People v Lake, 213 AD2d 494, 496 [1995], lv denied 86 NY2d 737 [1995]; compare People v Jimenez, 142 AD3d 149, 159 [2016]; People v Lewis, 125 AD3d 1109, 1113 [2015]). The exhibits attached to defendant's motion papers do not tend to substantiate the existence of such a cooperation agreement and the People deny that one existed. The record supports the People's assertion in this regard, as it contains a letter — dated September 5, 2017 — in which the People disclosed to defendant, during the middle of the trial, that the prosecutor had met with the victim and "told [her] that [he] would let the Albany County District Attorney's [o]ffice know that she had cooperated by testifying truthfully," but he "made no promises or representations with respect to whether that would impact the outcome of any case she ha[d] pending." As such, defendant did demonstrate his entitlement to a hearing on this issue.
As for his claim of actual innocence, defendant contends that the officers who investigated the victim's 911 call tampered with the crime scene. The documentary evidence annexed to defendant's motion papers with respect to this claim does not tend to substantiate it and is insufficient to make out a prima facie case of actual innocence (see People v Ramos, 194 AD3d 964, 966 [2021]; People v Velazquez, 143 AD3d 126, 137 [2016], lv denied 28 NY3d 1189 [2017]; compare People v Stetin, 192 AD3d 1331, 1334-1335 [2021]). Moreover, defendant's nonrecord claims of ineffective assistance of counsel are either unsubstantiated (see CPL 440.30 [4] [b]), contradicted by documentary evidence (see CPL 440.30 [4] [c], [d]) or would not entitle him to relief (see People v Satterfield, 66 NY2d at 799-800). We have considered defendant's remaining contentions and find them unavailing.
Garry, P.J., Aarons, Pritzker and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant also filed a CPL 440.10 motion prior to sentencing, but Supreme Court denied that motion on the ground that no relief under CPL 440.10 lies prior to the imposition of sentence (see People v Burdash, 102 AD2d 948, 949 [1984]).

Footnote 2: The victim was also arrested.

Footnote 3: Notwithstanding the lack of physical evidence, we note that both defendant and the victim testified that a gun was fired on the date in question.